**BRIDGES ENTERPRISES, INC., and R.C. Bridges, Plaintiffs-Appellants,**

v.

**EXXON COMPANY, U.S.A. (a DIVISION OF EXXON CORPORATION), Defendant-Appellee.**

No. 85–2821.

United States Court of Appeals, Fifth Circuit.

June 24, 1987.

Rehearing Denied Aug. 14, 1987.

Donald H. Grissom, Austin, Tex., Christopher B. Allen, Houston, Tex., for plaintiffs-appellants.

Robert G. Abrams, Washington, D.C., Charles W. Matthews, Houston, Tex., Catherine M. Shea, Washington, D.C., for defendant-appellee.

Before BROWN, RUBIN and GARWOOD, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This is an appeal from a denial of preliminary injunctive relief sought under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* (PMPA). The District Court held that the plaintiff-appellants, R.C. Bridges and Bridges Enterprises, Inc. (BEI)[1] had not demonstrated "sufficiently serious questions" regarding its claim of improper franchise termination and nonrenewal by defendant-appellee Exxon to warrant injunctive relief under the PMPA. Upon a review of the record, we hold that the District Court did not abuse its discretion in denying the injunction, and therefore affirm.

### Meet the PMPA

Because the statutory dictates of the PMPA control this case—even down to the modified requirements for the preliminary injunction—we begin with a brief overview of the Act. The PMPA is divided into three titles.[2] Title I was adopted in 1978, in response to perceived unequal bargaining power among refiners, distributors, and retailers. *Kostantas v. Exxon Co.,* 663 F.2d 605, 606 (5th Cir.1981); *Avramidis v. Arco Petroleum Products, Co.,* 798 F.2d 12 (1st Cir.1986). It is a comprehensive statutory framework set up to regulate petroleum distribution and marketing franchises. In adopting Title I, Congress sought to tem-

---

1. We refer to plaintiffs collectively as "BEI", except where the distinction between the two is relevant.

2. We are concerned only with Title I. Title II regulates the testing and disclosure of the oc-tane rating of gasoline. Title III prohibits the subsidization of motor fuel marketing operations with funds or services derived from other petroleum-related operations. *See* 15 U.S.C. §§ 2821–2824 & 2841.

per the franchisor's power to terminate unjustly a franchise or to refuse its renewal upon expiration. *See* S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S. Code Cong. & Ad.News 873. The statute is exclusive: a franchisor may terminate or nonrenew[3] a franchise only if its action is based on a permitted ground, and only if the stringent notification requirements of § 2804 have been met.

The PMPA lists ten grounds on which a franchise or franchise relationship may be ended; five are available either to terminate or nonrenew, five can be invoked only to nonrenew. One ground available for nonrenewal only is "[5.] a determination made by the franchisor in good faith and in the normal course of business ... to sell [the franchisee's leased] premises...." 15 U.S.C. § 2802(b)(3)(D)(i)(III).[4] It is this ground that Exxon relied on in nonrenewing BEI's franchise. BEI, however, charges that events surrounding Exxon's determination to sell the premises transformed what might have been a proper nonrenewal into a wrongful termination or nonrenewal. Accordingly, BEI sought a preliminary injunction pursuant to the PMPA.

### *Availability of Interim Relief*

The PMPA sets a more indulgent standard for relief than does the traditional Rule 65 preliminary injunction. Rather than requiring a showing of irreparable injury and a substantial likelihood of success, issuance of a preliminary injunction

under the PMPA is mandatory when a franchisee shows:

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed,

(ii) there exist sufficiently *serious questions* going to the merits to make such questions a *fair ground for litigation,* and

(iii) on balance, the hardship imposed upon the franchisor by issuance of such preliminary injunction is less than the hardship that would be imposed upon the franchisee if the injunction were not granted.

15 U.S.C. § 2805(b) (emphasis supplied). The section places the burden of showing termination of the franchise on the franchisee. The burden then shifts to the franchisor to show as an affirmative defense that the termination or nonrenewal was permitted. 15 U.S.C. § 2805(c). *See Khorenian v. Union Oil Co.,* 761 F.2d 533 (9th Cir.1985); *Moody v. Amoco Oil Co.,* 734 F.2d 1200 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984); *Humboldt Oil Co. v. Exxon Co.,* 695 F.2d 386 (9th Cir.1982); *see also* O'Brien, *Federal Laws Affecting a Franchise: Petroleum Marketing Practices Act,* 49 Antitrust L.J. 1371 (1981).

Undertaking to apply this revised standard, the District Court determined substantially on the full merits that Exxon nonrenewed BEI's franchise relationship

---

3. The Act's distinction between "termination of franchise" and "nonrenewal of franchise relationship" is deliberate. "Franchise" is defined in terms of contracts or leases relating to a motor fuel trademark license. 15 U.S.C. § 2801(1). "Franchise relationship" covers the broad range of "obligations and responsibilities ... which result from the marketing of motor fuel under a franchise." 15 U.S.C. § 2801(2). "The renewal provisions of the title address the renewal of the relationship between the parties rather than the specific rights or obligations under the franchise agreement." S.Rep. No. 731, 95th Cong., 2d Sess. 30, *reprinted in* 1978 U.S.Code Cong. & Ad.News 888. Nevertheless, the distinction seems primarily to have been drawn to avert a possible constitutional infirmity not here relevant. *See id.* at 31–32; 1978 U.S.Code Cong.Admin.News at 890.

4. The only reasons that are grounds for nonrenewal are:
   [1.] failure of the franchisor and the franchisee to agree to changes or additions to the franchise's provisions;
   [2.] continued customer complaints regarding the franchisee's operations;
   [3.] failure of the franchisee to operate the premises in a safe and healthful manner after being notified of such failure;
   [4.] good faith business decisions by the franchisor to change or convert the premises or a conclusion that the franchise is uneconomical.
   15 U.S.C. § 2802(b)(3)(B)–(D)

properly and consequently, that BEI had not satisfied the second prong of the test. The court therefore denied the injunction.

### Perils of the Pen

With that brief introduction to the intricacies of the PMPA, we now add some facts and background. R.C. Bridges, 74 years old, has done business with Exxon for over half a century. He has worked variously as a salaried employee, a commissioned agent, and a wholesale distributor. Originally, Bridges operated as a sole proprietor; in 1977, he formed the closely-held corporation of BEI, with himself and his wife as stockholders. On January 1, 1981, with an eye to estate planning and retirement, Bridges transferred a majority of the stock to his son R. Gust Bridges. Gust Bridges serves as the president of BEI.

On September 22, 1981, Exxon and BEI entered into a three-year distributor agreement. In addition, BEI leased from Exxon the bulk plant facilities BEI used for its business. Together, these two contracts, the distributor agreement and the lease, comprised the "franchise relationship" that is at the center of this lawsuit. At the time the relationship was entered into, both parties acknowledged that Exxon planned on selling the bulk plant when BEI's lease expired.[5] That fact remains undisputed.

And thus begins what turns out to be essentially a battle of paper. This case involves a busy series of letters, none identifiably written by lawyers, but many with serious legal implications. Some carry a strong intimation that, hovering over the shoulder of the lay scrivener, was one at least schooled in the PMPA, if not the law generally. Others, however, clearly do not. When the lawyers were finally called in—after the fact—they faced the unenviable job of pounding the round peg of unwitting businesspersons' correspondence into the square matrix of legal effect.

The majority of BEI's franchise term passed without incident. On December 16, 1983, Exxon sent its first letter[6] to BEI confirming Exxon's intention to sell the bulk plant facilities as soon as BEI's lease expired.[7] Exxon stated (erroneously) the lease expiration date as March 31, 1984. Exxon also mentioned that its formal offer to sell to BEI (required by the Act) would be forthcoming.

In conjunction with the sale of the premises, Exxon also notified BEI that its distributor agreement and franchise relationship would "terminate and not [be] renew[ed]" when those arrangements expired. However, it stated that, "Exxon is agreeable to entering into a new franchise relationship with you should you purchase the bulk plant facility...." Pursuant to

---

**5.** The PMPA permits a franchisor to sell its leased premises once the existing lease has expired, subject to an obligation to make a *bona fide* offer to sell to the current franchisee or offer it a right of first refusal of an offer made by another. 15 U.S.C. § 2802(b)(3)(D)(iii)(I) & (II).

**6.** Because of both the number and importance of the exchange of letters, the following chronology of correspondence is set out for ease of reference:

| | | |
|---|---|---|
| Franchise Signed | | 09/22/81 |
| 1. First Nonrenewal Notice | | 12/16/83 |
| From Exxon to R.C. Bridges | | |
| 2. Offer to sell premises—$48,000 | | 03/01/84 |
| From Exxon to R.C. Bridges | | |
| 3. Second (corrected) Nonrenewal Notice | | 06/21/84 |
| From Exxon to R.C. Bridges | | |
| 4. Acceptance of offer/Inquiry re selling out | | undated |
| From BEI (per Gust Bridges) to Exxon | | |
| 5. Third Nonrenewal/Reminder of no assignment | | 07/02/84 |
| From Exxon to BEI | | |

| | | |
|---|---|---|
| 6. Notice of agreements to sell BEI to Spencer | | 08/20/84 |
| From BEI (per Gust Bridges) to Exxon | | |
| 7. Response to Letter #4: franchise offer to R.C. Bridges only | | 08/24/84 |
| From Exxon to BEI | | |
| BEI Stock Sold to Spencer | | 08/29/84 |
| 8. Reiteration of acceptance of sell offer | | 08/29/84 |
| From R.C. Bridges to Exxon | | |
| 9. Franchise continuation offer to R.C. Bridges only | | 09/04/84 |
| From Exxon to Spencer | | |
| Lawsuit Filed | | 01/30/85 |
| 10. Termination Notice | | 02/14/85 |
| From Exxon to BEI | | |

**7.** As in many areas of the franchise, the PMPA dictated the form and requirements of this notice letter. For a discussion of the intricacies of proper notification, see *Avramidis v. Arco Petroleum Products Co.*, 798 F.2d 12 (1st Cir.1986).

the PMPA, on March 1, 1984, Exxon sent its formal offer to sell the bulk plant to BEI for $48,000.

On June 21, 1984, Exxon sent another nonrenewal notice to BEI. Apparently, Exxon had made a mistake in calculating the dates on which BEI's agreements expired. The June 21 notice corrected the expiration dates to the proper date of October 1, 1984,[8] and reiterated the substance of the December 1983 notice.

In an undated reply, R. Gust Bridges, the son, responded to Exxon's notices of nonrenewal. The younger Bridges, on behalf of BEI, stated "we plan on entering a new franchise relationship with Exxon Company." But the letter also raised the issue of transferring ownership control of BEI. "[I]f we sell [out] to another branded jobber, [on] what terms would Exxon accept him as its distributor?" This was the first mention of the possibility that the Bridges, as individuals, would not be continuing on as the sole stockholders of BEI.

On July 2, in a combination reply letter and nonrenewal notice, Exxon responded to Gust Bridges' questions. The letter, addressed to BEI, states that "your contracts with Exxon are not assignable. Further, those contracts now expire and will not be renewed.... [I]t continues to be Exxon's desire to offer a new Distributor Agreement to you upon your making arrangements for service and facilities which are satisfactory to Exxon, or purchasing the leased bulk plant."

Despite these proper and relatively clear notices of BEI's franchise nonrenewal, on August 29, 1984, the Bridges as sole stockholders sold their BEI stock to two individuals, Jerry Spencer and Ted Helbig, for $15,000. The Bridges, in a transaction separate from the stock sale, also simultaneously sold BEI's physical assets for $130,000 to Bob McAllen.

At this point in the argument, the parties keenly and vigorously debate the importance of the Key Person Clause (KPC).[9] The KPC substitution issue could be important in this case because R.C. Bridges did transfer ownership control of BEI. If Bridges did not effectively request a substitution of Spencer or Helbig as new Key Person, then ownership control would have resided in someone other than the Key Person. Accordingly, Exxon would have been entitled, pursuant to § 20 of the agreement, to terminate BEI's franchise. See 15 U.S.C. § 2802(b)(2)(A). On the other hand, if R.C. Bridges did request a substitution, but Exxon unjustifiably refused its approval, then "serious questions going to the merits" of improper termination might well be raised, calling for issuance of the statutory preliminary injunction.

In this case, however, the District Court found that a letter dated August 20, 1984, from R.C. Bridges to Exxon, although arguably attempting to request the Key Person change, did not satisfy the KPC's requirements. This fact finding is supported by evidence in the record and is not clearly erroneous. Thus, the transfer of ownership control to someone other than the Key Person did violate the KPC, and did give Exxon proper grounds for terminating the franchise.

The stock sale, however, took place some two months after Exxon's first corrected nonrenewal notice of June 21, 1984. The nonrenewal notice, if valid, was an effective and permitted means to end BEI's franchise relationship and thus controls the disposition of this case. As such, we limit our review to the nonrenewal issues, without having to reach the sticky wicket of termination and the KPC.

In November 1984, after their purchase of BEI's stock, Spencer and Helbig began the process of buying the bulk plant prem-

---

8. Exxon made no effort to take over the premises on March 31, the (wrong) date stated in the first notice.

9. In essence, the KPC is a covenant in the distributor agreement that the franchisee's "Key Person", the elder R.C. Bridges, would maintain ownership control of the franchise and would operate it on a daily basis. Failure of either condition was grounds for termination (not nonrenewal) of the franchise by Exxon. On the other hand, the franchisee, BEI, had the right to seek substitution of the Key Person by making a written request to Exxon. Exxon could not "unreasonably" deny such a request.

ises under the $48,000 offer originally made to BEI while the Bridges still owned the company. Although Exxon was quite willing to sell the *premises* to these new BEI owners, it refused to sign a *franchise* agreement with the newly constituted BEI. Exxon maintained that, quite apart from the offer to sell the premises, its offer to continue the franchise relationship was directed solely at R.C. Bridges, the Key Person. Spencer and Helbig refused to buy the premises without also obtaining a franchise, and the deal collapsed.

After a grievance hearing in January 1985 failed to resolve the dispute, Bridges and BEI filed this suit.[10] Unlike the typical preliminary injunction proceedings, counsel and the court in this case expended significant energy in discovery and development of the record. Lengthy deposition testimony, totaling some 1387 pages, was taken from the eight major participants in the case. The pleadings and motions filled three volumes at the District Court level. In addition, Judge Black, to whom the case was transferred early on from the late Judge Cire, held a hearing preliminary to the motion for the injunction hearing to supervise effectively the parties' efforts. Thus, by the time the motion for injunctive relief came on to be heard, the issues were thoroughly developed and were familiar to the court. For all practical purposes, the total proceedings amounted to a full trial on the merits with no indication from BEI and the Bridges that there either was, or would later be offered, any additional or

further evidence. It was, and was thought to be, ready for final disposition.

After the extended motion hearing itself, both sides filed detailed and authoritative post-argument briefs. The District Court then took the record and argument at the hearings as a whole under advisement. On November 1, 1985, in ruling on the motion for a preliminary injunction, the District Court held that Exxon had wholly satisfied its obligations as franchisor under the PMPA by (i) nonrenewing BEI's franchise, for the permitted purpose of selling the premises, and (ii) making a *bona fide* offer of those premises to BEI. The court disposed of the KPC issue by finding that R.C. Bridges had never made a satisfactory request for substitution.[11] This threshhold determination necessarily defeated all of BEI's remaining claims over the KPC. Finally, the court found that the offer to continue or enter into a new franchise was made to R.C. Bridges individually, *not* to BEI, and thus, held that Exxon had no duty to grant a new franchise to the new owners of BEI. Accordingly, the court held that there were no questions remaining that were sufficiently serious to compel the issuance of an injunction, and denied the motion. This appeal follows.

### *Whither Goeth the Franchise?*

On appeal, BEI's case turns on one primary[12] contention: that Exxon wrongfully refused to enter into a franchise relationship with BEI, after Spencer and Helbig bought out the Bridges' ownership interest. We reject this argument.[13]

---

**10.** On February 14, 1985, Exxon sent BEI a notice of termination (not nonrenewal). This notice was grounded on a breach of the KPC. The termination notice itself incorporated the prior nonrenewal notices and stated that they remained valid and had not been abandoned. The District Court agreed and made a fact finding on the continuing vitality of the nonrenewal notice. As discussed above, the prior notices of nonrenewal, if valid, were effective to end the franchise and are dispositive in deciding this case.

**11.** *See supra* note 9 and accompanying text.

**12.** As discussed above, BEI also stressed the importance of the KPC substitution issue in its appeal brief. As we have already affirmed the

District Court's rejection of that argument, however, we do not address it again here.

**13.** Not surprisingly, there are relatively few reported cases at the appellate level dealing with the PMPA. One open question, not addressed by the parties, is what the proper standard of review should be for PMPA injunctions. Although this circuit has apparently not yet ruled, the First, Seventh and Ninth Circuits have held that the standard of review for injunctive relief cases under the PMPA is the same as for a typical Rule 65 preliminary injunction: the denial of a preliminary injunction may be reversed only upon a showing of abuse of discretion. *Plains Cotton Coop. Ass'n v. Goodpasture Computer Service, Inc.,* 807 F.2d 1256, 1259 (5th Cir.1987); *Dallas Cowboy Cheerleaders, Inc. v.*

BEI's focus on Exxon's refusal to continue the BEI franchise with Spencer and Helbig is grounded in the legal imprecision of the parties' correspondence. BEI's thesis runs this way: Exxon's letters and non-renewal notices all contain language emphasizing Exxon's desire to continue the franchise relationship with *BEI*. Several of the letters were addressed to "Bridges Enterprises, Inc.," with a salutation of "Gentlemen." Further, the actual franchisee in the franchise relationship is BEI, not R.C. Bridges. Thus, BEI contends that any language encouraging a renewal of a franchise must have been directed at BEI, the corporate entity. This argument is buttressed by the fact that the offer to sell the leased premises was also made to the franchisee, BEI. In sum, Spencer and Helbig were not assignees [14] of the BEI franchise; they were the new owners of BEI, but BEI itself remained unchanged as the franchisee. Accordingly, any offer made to BEI was, as a practical matter, made to Spencer and Helbig. Because Gust Bridges, while still a BEI shareholder, had written to Exxon purporting to accept Exxon's offer to buy the leased premises and to continue the franchise relationship, that acceptance was valid as to and inured to the benefit of Spencer and Helbig as succeeding owners of the franchisee, BEI.

In reply, Exxon argues that it made two discrete offers to two independent entities: it offered to sell the bulk plant to BEI, the franchisee, but offered to continue the franchise only with R.C. Bridges, the individual. Under the PMPA, Exxon's *bona fide* offer of the property satisfied all of its obligations to the franchisee. Any additional offer, such as one extending the franchise relationship, was clearly not compelled by the Act. Exxon maintains that it desired to continue the franchise with the elder Bridges because of their longstanding and warm relationship.

Exxon's correspondence, however, does not make plain any such distinction between its offers. Although Exxon's explanation that it made one offer to BEI for the property, and another to Bridges for the franchise is certainly plausible, the letters themselves do not compel such a conclusion. Roughly half of Exxon's letters and notices were sent to R.C. Bridges, the remainder to Gust Bridges or BEI. All of Exxon's letters used frequently the personal pronoun "you," regardless of whether the notice was addressed to R.C. Bridges or BEI, or used the salutation of "Mr. Bridges" or "Gentlemen." Further, within each letter itself, Exxon makes no perceptible shift in tone from the language offering the property to "you, BEI" to that offering the franchise to "you, R.C. Bridges."

This is not to say that it is incredible that two non-lawyer businessmen, in a working relationship for many years, might blur the lines between corporate and personal identification. Indeed, in these closely-held corporations or sole proprietorships, the Key Person very probably is, in effect, the franchisee. It is not at all unexpected that correspondence by a non-lawyer might use the word "you" in one letter to make offers to two separate but related entities. The construction and legal interpretation of such correspondence is unavoidably a difficult task, but certainly, the District Court's interpretation that two offers were made to

---

*Scoreboard Posters, Inc.,* 600 F.2d 1184, 1187 (5th Cir.1979). Although the standard of review may verbally be the same, we nevertheless must recognize that abuse of discretion must be measured in terms of the peculiar standards of the PMPA itself, that is, whether (i) the franchise has been terminated, (ii) "serious questions" warranting litigation exist, and (iii) the relative hardship of an injunction would weigh more heavily on the franchisee or the franchisor (with no prerequisite of irreparable injury). This modifies, if it does not alter, the traditional factors of (a) inadequate remedy; (b) irreparable injury; (c) likelihood of success; (d) public interest. *See Avramidis v. Arco Petroleum Products Co.,* 798 F.2d 12, 16 (1st Cir.1986); *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1217 (7th Cir.1984); *Humboldt Oil Co. v. Exxon Co.,* 695 F.2d 386, 387 (9th Cir.1982).

**14.** Section 16 of the Distributor Agreement prohibits transfer or assignment "in whole or in part, directly or indirectly." Violation of that section is grounds for termination under § 20(a)(ii) of the agreement.

two distinct entities is supported by the record.[15]

Although the PMPA may have compelled Exxon to offer to sell the leased premises to BEI, regardless of who owned the corporation, the Act does not force Exxon to surrender its business judgment in determining with whom to enter into a new franchise relationship. After a review of the record as a whole, the District Court agreed with Exxon's contention that it owed no legal rights to Spencer and Helbig. Further, it determined that Exxon had no duty to enter into a franchise relationship with individuals who purchased the franchise corporation after the notices of nonrenewal were properly issued.

The fact finding that Exxon made two distinct offers is supported by evidence in the record and is not clearly erroneous. As a matter of law, then, the legal conclusion that Exxon owed no duty to the new owners of the corporation to enter into a franchise relationship can readily be affirmed: the franchise continuation offer went only to R.C. Bridges, the individual, and therefore, any change in ownership of BEI, the corporation, was simply irrelevant.[16] Denial of the preliminary injunction was neither an abuse of discretion nor error of law.

AFFIRMED.

---

**15.** Indeed, as Judge Black himself noted: "This [legal situation] is hard because these people simply weren't totally aware of their rights and obligations at the time they wrote all these letters or they wouldn't have written them the way they did." (Transcript, Motion hearing at 59, Oct. 21, 1985.)

**16.** As required by the PMPA, the offer to sell the premises was made to BEI, the corporation.

Accordingly, the PMPA does mandate that *that* offer remain open to BEI, regardless of any change in ownership. It is undisputed that Exxon remained willing to sell the bulk plant to Spencer and Helbig. Indeed, Exxon declared at the hearing on the motion for preliminary injunction that it remained willing to sell the bulk plant to BEI. (Rec. Vol. 4 at 29–30.)