United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 18, 2003**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 02-21028

_____

ABRAMS SHELL; TOWN CENTER SHELL; PALM SPRINGS SHELL; LORNA RATONELL; FOUAD DAGHER; HOUDA, INC.; and GARNERVILLE SHELL, on behalf of themselves and those similarly situated

Plaintiffs-Appellants,

versus

SHELL OIL COMPANY; EQUILON ENTERPRISES, LLC; MOTIVA ENTERPRISES, LLC; EQUIVA SERVICES, LLC,

Defendants-Appellees.

_____

Appeal from the United States District Court
For the Southern District of Texas

_____

Before WIENER, CLEMENT, and PRADO, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Plaintiffs are independent lessee-dealers of Shell-branded gasoline stations who contend that Defendants violated the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.* (2003), by presenting a new set of franchise agreements in a "take it or leave it" manner. The district court found that the PMPA does not permit claims for constructive termination, so the court granted Defendants' motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6). Plaintiffs appeal. We AFFIRM.

1

# I. FACTS AND PROCEEDINGS

## A. Factual Background

Until 1998, Shell Oil Company ("Shell") entered into franchises directly with independent lessee-dealers throughout the country. In 1998, Shell formed two joint ventures with other companies: Equilon Enterprises LLC ("Equilon") and Motiva Enterprises LLC ("Motiva").[1] Equilon and Motiva later formed a separate company, Equiva Services LLC ("Equiva"), to handle their overhead, administrative, and legal matters.[2]

Shell and its partners transferred their refining and marketing assets, including all service station assets and associated petroleum franchises, to Equilon and Motiva. The assets were divided geographically, with Equilon receiving assets in the western United States and Motiva receiving assets on the East Coast and the Gulf Coast.[3] All of the independent lessee-dealers continued doing business under the Shell brand.

There are two agreements required to establish a petroleum franchise: (1) a Retail Facility Lease covering the lease of the service station premises; and (2) a Retail Sales Agreement providing

---

[1] Shell and Texaco, Inc. ("Texaco") formed Equilon, and Shell, Texaco, and Saudi Refining, Inc. ("Saudi") formed Motiva.

[2] It appears that Shell recently acquired its joint venture partners' shares in Equilon and Motiva, so Shell now owns Equilon, Motiva, and consequently Equiva. This change in corporate ownership has no impact on this case because the events in dispute occurred long before any of the recent share acquisitions.

[3] Independent lessee-dealers in California became franchisees of Equilon, and independent lessee-dealers in Texas and New York became franchisees of Motiva.

for the sale of gasoline.[4] In 1999, Equilon and Motiva sought to replace the existing franchise agreements[5] with a uniform set of franchise agreements[6] ("New Agreements"). Apparently, certain independent lessee-dealers found the New Agreements to be so objectionable that several lawsuits, including this one, were quickly filed.

In this case, Plaintiffs are independent lessee-dealers operating Shell-branded gasoline stations in three states (California, New York, and Texas) and up to five federal judicial districts (the Central and Southern Districts of California, the Southern District of New York, and the Eastern and Northern Districts of Texas). Shell, Equilon, Motiva, and Equiva (collectively, "Defendants") all have their headquarters and principal places of business in Houston, Texas.

Plaintiffs allege that Defendants violated the PMPA by presenting the New Agreements in a "take it or leave it" manner to Plaintiffs.[7] The cover letter to the New Agreements stated, "If you do

---

[4] These two agreements are normally supplemented by a third one: a trademark agreement providing for the use of a brand name (e.g., Shell) by the franchisee.

[5] The existing franchise agreements consisted of the different agreements that had governed the relationships between Shell and its franchisees, Texaco and its franchisees, and Saudi and its franchisees until the assignment of the respective franchise agreements to Equilon and Motiva.

[6] The revised set of agreements was developed by Equilon and Motiva in conjunction with Equiva.

[7] The Plaintiffs also object to the content of the New Agreements. Specifically, Plaintiffs allege that the New Agreements contain unlawful waivers; forfeitures; penalties; limitations of liability; reductions of the applicable statute of limitations governing claims against Equilon, Motiva, and Equiva; unconscionable penalties in the form of liquidated damages; commercially unreasonable and excessive transfer fees; and unreasonable restraints on alienation of the franchisee's interest in the franchise in the form of a unilateral consent clause giving Equilon, Motiva, or Equiva the unilateral right to approve or disapprove of a proposed sale or conveyance of the franchisee's interest in the franchise. However, Plaintiffs' brief clearly focuses not on the content of the New Agreements, but rather on the manner in which they were presented to Plaintiffs.

not sign and return the Lease and other enclosed documents in a timely manner, be advised that Equilon will issue without further warning a non-rescindable notice of non-renewal pursuant to the terms of the [PMPA]."[8] Sales consultants for one or more of Defendants allegedly indicated to Plaintiffs that the New Agreements had to be signed "as is," without making any changes to the agreements.

Plaintiffs allege that the purpose of the New Agreements is either: (1) to prevent renewal of the franchise relationship, (2) to create conditions justifying termination of the franchise relationship, and/or (3) to convert Plaintiffs' stations into company-operated stations run by Equilon, Motiva, and/or Equiva.

Although Plaintiffs did not like the content of the New Agreements or the manner in which they were presented, Plaintiffs apparently signed the New Agreements and continue to operate Shell-branded gasoline service stations.

### B. Procedural History

Plaintiffs originally filed their suit in the U.S. District Court for the Central District of California ("California district court"). Defendants filed three motions to dismiss in the California district court: a motion to dismiss and/or transfer based on improper venue; a motion to dismiss for lack of proper personal jurisdiction; and a motion to dismiss Shell and Equiva for failure to state a claim under Rule 12(b)(6). The California district court granted the motion to transfer to the U.S.

---

[8] The quoted language is found in a cover letter from Equilon to one Plaintiff. Given the uniform nature of the New Agreements, we will assume that all of the Plaintiffs received the same cover letter from Equilon and Motiva.

District Court for the Southern District of Texas ("Texas district court") based on improper venue.[9]

Defendants then filed a motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6) in the Texas district court, arguing: (1) Plaintiffs did not allege any actual termination or non-renewal of the franchise relationship, thus they could not invoke the protection of the PMPA; and (2) Shell and Equiva are not franchisors within the meaning of the PMPA. The Texas district court granted the motion to dismiss, finding that the PMPA only covers actual terminations, not constructive terminations. The Texas district court did not reach the issue of whether Shell and Equiva are franchisors within the meaning of the PMPA. Plaintiffs appeal.

## II. STANDARD OF REVIEW

This Court reviews dismissals for failure to state a claim *de novo*. *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995). "Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

"We review all questions concerning venue under the abuse of discretion standard." *United States v. Lipscomb*, 299 F.3d 303, 338 (5th Cir. 2002).

## III. DISCUSSION

### A. Constructive Termination/Nonrenewal

Defendants never actually terminated or refused to renew their franchise agreements with Plaintiffs. Indeed, Plaintiffs signed the New Agreements and continue to operate as franchisees. For this reason, Plaintiffs only allege that their franchise agreements were *constructively* terminated or

---

[9] The California district court concluded that under the specific PMPA venue provision contained in 15 U.S.C. § 2805(a), venue did not lie in the California district court and that the Texas district court was the only proper venue for Plaintiffs' PMPA claim.

nonrenewed.

It is important to distinguish between claims for constructive termination and claims for constructive nonrenewal. To differentiate between these claims, it is necessary to examine how the PMPA distinguishes between termination and nonrenewal. First, the PMPA distinguishes between terminations of *franchises* and nonrenewals of *franchise relationships.* 15 U.S.C. § 2802(a). This distinction is meaningful: a franchise consists of "specific rights or obligations under the franchise agreement," but the term "franchise relationship" refers to the actual "relationship between the parties." *Bridges Enters., Inc. v. Exxon Co., U.S.A.*, 820 F.2d 123, 124 n.3 (5th Cir. 1987); *Beachler v. Amoco Oil Co.*, 112 F.3d 902, 905 n.1 (7th Cir. 1997) ("The renewal provisions of the [PMPA] address the renewal of the relationship between the parties rather than the specific rights or obligations of the parties under the franchise agreement.").

Second, the grounds upon which a franchise may be terminated are not coextensive with the grounds for nonrenewal of a franchise relationship. *See* 15 U.S.C. § 2802(b)(1)(B) (indicating that terminations may be based upon any ground listed in § 2802(b)(2), but nonrenewals may be based upon any ground listed in § 2802(b)(2) and (3)); *Bridges Enters.,* 820 F.2d at 124 ("The PMPA lists ten grounds on which a franchise or franchise relationship may be ended; five are available either to terminate or nonrenew, five can be invoked only to nonrenew.").

Third, termination occurs "prior to the conclusion of the term, or the expiration date, stated in the franchise." 15 U.S.C. § 2802(a). In contrast, nonrenewal can only take place "at the conclusion of the term, or on the expiration date, stated in the relevant franchise." 15 U.S.C. § 2801(14)(A); *Meghani v. Shell Oil Co.*, 115 F. Supp. 2d 747, 753 (S.D. Tex. 2000). In other words, termination

6

can happen at any time, but nonrenewal typically occurs within a narrower temporal context.[10]

The Fifth Circuit has not yet decided in a published case whether to recognize claims for constructive termination under the PMPA. *See, e.g., April Mktg. & Distrib. Corp. v. Diamond Shamrock Ref. & Mktg. Co.*, 103 F.3d 28, 29 (5th Cir. 1997) ("This circuit has not recognized a cause of action for 'constructive termination' under the PMPA."). However, in *McGinnis v. Star Enter.*, No. 93-1234, 8 F.3d 20 (December 21, 1993) (unpublished), the Court held that "the plain meaning of the [PMPA] does not provide for 'constructive termination.'" *Id.* at 9. The Court noted in particular that the plaintiff in *McGinnis* had "continued as a franchisee at all times relevant to this action [and] present[ed] no summary judgment evidence that [showed that the defendant] unilaterally cancelled the franchise agreement or that [the plaintiff] was forced to sign the cancellation agreement." *Id.* at 9-10.

Under 5TH CIR. R. 47.5.3, "[u]npublished opinions issued before January 1, 1996, are precedent."[11] Therefore, the Court is bound by its decision in *McGinnis*, unless the language in that case regarding constructive termination claims under the PMPA was mere *dicta*. In *April Mktg.*, the Court indicated that the *ratio decidendi* of *McGinnis* was the broad conclusion that "each of plaintiffs' claims is either barred by the release clause or lacks adequate evidence to survive summary judgment." *April Mktg.*, 103 F.3d at 29 n.2 (quoting *McGinnis*, No. 93-1234, at 10). The Court also implied that the language regarding constructive termination claims under the PMPA was mere *dicta*. *Id.* Even though *McGinnis* seemingly disallowed constructive termination claims under any

---

[10] Where the franchise agreement does not specify a term of duration or an expiration date, nonrenewal can happen at any time. 15 U.S.C. § 2801(14)(B).

[11] 5TH CIR. R. 47.5.3 became effective on October 17, 1995.

circumstances, the Court in *April Mktg.* explicitly discussed the circumstances in which a constructive termination claim would be recognized. *Id.* at 29-31; *McGinnis*, No. 93-1234, at 9-10.

A close reading of *McGinnis* indicates that its language regarding constructive termination claims is indeed *dicta*. The core issue in *McGinnis* was whether the plaintiff's claims were barred by the settlement agreement and release that had resolved the parties' prior dispute. *McGinnis*, No. 93-1234, at 3-5. The plaintiff failed to allege or provide evidence of any wrongful conduct occurring after the date of the settlement agreement, so the Court found that the plaintiff's claims were barred by the release. *Id.* at 8-9. The conduct underlying the constructive termination claim was the same conduct underlying the other claims made by the plaintiff, thus the Court's conclusion that the plaintiff's claims were barred vitiated the need to discuss the merits of the plaintiff's constructive termination claim. *Id.* at 3-5. For this reason, the Court will consider the language in *McGinnis* to be *dicta*, and thus persuasive rather than binding.[12]

In *April Mktg.*, the Court, though declining to decide whether the PMPA permitted constructive termination claims, indicated that it would only recognize such a claim if the plaintiffs alleged a breach of the franchise, which "consists of three core components: a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold."[13] *April Mktg.*, 103 F.3d at 30 n.3. Plaintiffs do

---

[12] In *Meghani*, the district court asserted that the language in *April Mktg.* regarding constructive termination claims under the PMPA was *dicta*, but this characterization appears to be incorrect. 115 F. Supp. 2d at 757-58. Although the Court declined to decide whether constructive termination claims should be recognized under the PMPA, the Court specified which allegations were necessary to support a constructive termination claim under the PMPA. *See discussion infra.*

[13] This approach is largely consistent with the decisions of our sister circuits, though most circuits have only considered constructive termination claims in cases where the franchisor

8

not allege that Defendants breached any of the three core components constituting the respective franchises; therefore, Plaintiffs' allegations do not amount to a cognizable claim for constructive termination under the PMPA. *April Mktg.*, 103 F.3d at 30-31 ("[W]e conclude that a franchisor's actions, if those actions do not breach the franchise, cannot be considered a 'termination' within the meaning of the PMPA."); *Fresher v. Shell Oil Co.*, 846 F.2d 45, 46-47 (9th Cir. 1988) (same).

The Fifth Circuit has not yet decided whether to recognize claims of constructive nonrenewal under the PMPA. Indeed, it appears that no court in this Circuit has previously considered a claim of constructive nonrenewal under the PMPA.[14] Most circuits seem to agree on the test that should be applied to claims of constructive nonrenewal: "when a franchisee alleges that a franchisor has 'failed to renew' the parties' franchise relationship, . . . it must demonstrate that at least one of the three essential components of a petroleum franchise has been discontinued." *Dersch Energies v. Shell Oil Co.*, 314 F.3d 846, 864-65 (7th Cir. 2003).

assigned the franchise agreement to a third party. *See, e.g., Shukla v. BP Exploration & Oil*, 115 F.3d 849, 859-68 (11th Cir. 1997); *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744, 750-52 (1st Cir. 1991); *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 918-19 (6th Cir.1989); *Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 362-64 (4th Cir.1986). In such cases, a constructive termination claim also exists where the assignment violates applicable state law. *See, e.g., Shukla*, 115 F.3d at 852-53; *Chestnut Hill*, 940 F.2d at 750-51; *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d at 922; *Barnes*, 795 F.2d at 362 (explaining that violations of state law are relevant because "as a general rule, assignability of franchises is a matter left to State law") (quoting S. Rep. No. 731, 95th Cong., 2d Sess. 17, 23-24, reprinted in 1978 U.S. Code Cong. & Ad. News 873, 876). Plaintiffs do not allege that Shell (or another party) constructively terminated the existing franchise agreements by assigning them to a third party (e.g., Equilon), thus the Court will not examine whether the assignment of the existing franchise agreements violated applicable state law.

[14] It is unclear whether the plaintiffs in *Meghani* asserted a claim of constructive nonrenewal. The district court noted that the plaintiffs did not distinguish between constructive termination and constructive nonrenewal, and the court only referred to constructive termination in its opinion. 115 F. Supp. 2d at 755 n.25. On the other hand, the court stated in a footnote that the plaintiffs intended to raise both claims. *Id.* at 756 n.29.

In *Dersch Energies*, Shell presented the plaintiffs with new franchise agreements in a "take it or leave it" manner, and the plaintiffs signed the new agreements. *Id.* at 859-60. The plaintiffs based their constructive nonrenewal claim on the manner in which the agreements were presented. *Id.* at 860. However, the Seventh Circuit held that "[b]ecause [the plaintiff] [did] not argue that the defendants' alleged violation of [the PMPA] resulted in the nonrenewal of a lease of retail premises, motor fuel supply contract, or the contract to use the Shell trademark in connection with retail sales, it cannot demonstrate the nonrenewal of its franchise relationship within the meaning of the PMPA."[15] *Id.*

We find the Seventh Circuit's reasoning in *Dersch Energies* to be especially persuasive, thus we apply the same logic to this case.[16] Plaintiffs have not provided any evidence that Defendants failed to renew the relevant agreements; therefore, Plaintiffs have not shown a breach in the franchise relationship. *Id.*

## B. Transfer

[15] Although the tests for constructive termination claims and constructive nonrenewal claims are similar, the Court notes that they are not identical. For example, the terminology differs: the constructive termination test focuses on the franchise, and the constructive nonrenewal test focuses on the franchise relationship. In addition, plaintiffs can argue that the assignment of a franchise agreement violated applicable state law, and thereby constructively terminated the agreement. *See supra* note 14. However, plaintiffs can not base their constructive nonrenewal claims on the assertion that the assignment of a franchise agreement violated applicable state law. *Dersch Energies*, 314 F.3d at 860.

[16] The Court recognizes that the Ninth Circuit adopted a different test for constructive nonrenewal claims in *Pro Sales, Inc. v. Texaco, U.S.A.*, 792 F.2d 1394, 1399 (9th Cir. 1986) ("[A] franchisee who signs a successor contract under protest and promptly seeks to invoke its rights under the PMPA . . . has not 'renewed' the franchise relationship so as to bar relief under the PMPA."). In *Dersch Energies,* the Seventh Circuit rejected the *Pro Sales* approach based on a "franchisee's ability to obtain an injunction under the PMPA" in cases of nonrenewal. *Dersch Energies*, 314 F.3d at 865. We reject the *Pro Sales* approach on the same basis.

10

The PMPA contains a specific venue provision that authorizes a franchisee to bring suit in either of two different venues: (1) the district in which the franchisor has its principal place of business, or (2) the district in which the franchisee is doing business. 15 U.S.C. § 2805(a).

Either some or all of Defendants are franchisors. All Defendants have their headquarters and principal places of business in Houston, Texas, which is located in the Southern District of Texas.[17] Therefore, venue is proper in the Southern District of Texas. *Id.*

Plaintiffs are located in three different states and up to five judicial districts, thus there is no single district in which all Plaintiffs are doing business. This Court has not yet addressed whether, in order for venue to be proper under the PMPA, all named plaintiffs in a class action must be located in the district where they file suit. The California district court held:

> Notwithstanding the relaxation of venue and personal jurisdiction requirements as to *unnamed* members of a plaintiff class, it is by now well settled that these requirements to suit must be satisfied for *each and every named plaintiff* for the suit to go forward.

*Abrams Shell v. Shell Oil Co.*, 165 F. Supp. 2d 1096, 1107 n.5 (C.D. Cal. 2001). The leading case on this issue explains why all named plaintiffs in a class action must satisfy the venue requirements:

> The central function of venue generally is to regulate the forum in which a party may appear or may force another party to appear personally, in a suit in which the court would otherwise have jurisdiction. In the ordinary case, the party has been brought personally before the court, by service of process or by filing the action, and the only question is whether the court sits in the proper district (as defined by the venue statutes) to hear the case. Venue is therefore intimately connected to and predicated upon the personal appearance of the party. Because class actions do not necessarily require the presence of a class member before the court for an adjudication of his/her rights and liabilities, venue restrictions are not determinative of the ability of the court to hear the action with respect to all members of the class. As most courts have held, *the relevant venue question in such circumstances is whether venue is proper as among the parties who have in fact been brought personally before the court as named*

---

[17] Defendants concede that Equilon and Motiva are franchisors. Plaintiffs argue that Shell and Equiva are also franchisors under the PMPA. We need not reach this issue because all Defendants are located in the same judicial district.

*parties to the action, the parties representing and in effect standing in for the absent class members.*

*United States v. Trucking Employers, Inc.*, 72 F.R.D. 98, 100 (D.D.C. 1976) (emphasis added).

District courts in the Fifth Circuit have consistently held that all named plaintiffs to a class action must satisfy the venue requirements. *See, e.g., Bywaters v. United States*, 196 F.R.D. 458, 464-65 (E.D. Tex. 2000) ("[T]he relevant venue question in a class action is whether venue is proper as to the parties representing, and 'in effect standing in for the absent class members.'"); *Johnson v. United States*, 208 F.R.D. 148, 167 (N.D. Tex. 2001) ("Here, the plaintiffs have limited the class to those plaintiffs who reside in the Western District of Texas in order to avoid the venue issue."). Based on this caselaw, we hold that venue is not proper in the Central District of California because all the named plaintiffs are not located there.

Under the PMPA, venue was only proper in the Southern District of Texas; therefore, it was not abuse of discretion for the California district court to transfer the case.

## IV. CONCLUSION

Based on the foregoing reasons, the Court AFFIRMS the judgment of the district court.

12