A.V. MEGHANI, et al., Plaintiffs,

v.

SHELL OIL COMPANY,
et al., Defendants.

No. CIV. A. H–00–0547.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 29, 2000.

Paul B. Rosen, Brian L. Jensen, Jensen, Rosen & Steinberg, P.C., Houston, TX, for plaintiffs.

J. Gregory Copeland, J. Michael Baldwin, Baker Botts L.L.P., Houston, TX, Ann Spiegel Senior Litigation Counsel, Houston, TX for defendants.

## AMENDED MEMORANDUM AND ORDER

ATLAS, District Judge.

Pending before the Court in this gasoline dealer franchise dispute is the Defendants' Motion to Dismiss Plaintiffs' Petroleum Marketing Practices Act Claim ("Defendants' Motion") [Doc. # 10].[1] Plaintiffs are former and current owners of Shell gas station franchises.[2] Plaintiffs have responded in opposition.[3] The Court has considered all matters of record and the applicable authorities, and concludes that Defendants' Motion should be **granted**.[4]

---

1. *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Petroleum Marketing Practices Act (PMPA) Claim [Doc. # 11].

2. Plaintiffs include individuals A.V. Meghani, Shiraz Meghani, and Saleem Meghani, and corporations Hussaini Enterprises, Inc., Halimi Enterprises, Inc., Hyderi Enterprises, Inc. and Hassani Enterprises, Inc.

3. *See* Response to Defendants' Motion and Plaintiffs' Memorandum of Law in Support of Their Opposition to Defendants' Motion ("Plaintiffs' Response") [Doc. # 12]. Defendants have also filed a reply. *See* Defendants' Reply to Plaintiffs' Response to Defendants' Motion to Dismiss ("Reply") [Doc. # 13].

4. The Court issued its ruling originally in a Memorandum and Order signed May 24, 2000 ("May 24th Memorandum") [Doc. # 14]. Plaintiffs sought reconsideration of that ruling as a matter of law and pointed out what they perceived were factual inaccuracies in Court's ruling. *See* Plaintiffs' Motion for Reconsideration/Amendment of Judgment ("Reconsideration Motion") [Doc. # 18] and Plaintiffs' Memorandum of Law in Support of Their Motion for Reconsideration ("Plaintiffs' Reconsideration Memorandum") [Doc. # 19], to which Defendants responded. *See* Defendants' Response to Plaintiffs' Motion for Reconsideration ("Defendants' Reconsideration Response") [Doc.# 21]. Plaintiffs also have filed a Rejoinder to Defendants' Response to Plaintiffs' Motion for Reconsideration ("Plaintiffs' Reply") [Doc.# 22].

Through the Reconsideration Motion, Plaintiffs have refined their theories under the Petroleum Marketing Practices Act ("PMPA").

## I. FACTUAL BACKGROUND

In mid–1999, Plaintiffs owned and operated twenty-nine Shell-brand gasoline stations in Houston, Texas. Plaintiffs filed this suit complaining of Shell's actions regarding twenty-one of their stations. *See* Plaintiffs' Original Complaint ("Plaintiffs' Complaint") [Doc. # 1]. Of these twenty-one stations, eighteen were operated under agreements that were not to expire until very late 1999 or thereafter.[5]

Defendants Shell Oil Company, Motiva Enterprises L.L.C. and Equiva Services L.L.C. (collectively, "Shell") are in the business of selling gasoline in the United States. One part of this business includes Shell-owned retail service stations that it leases to independent dealers ("lessee-dealers").

The "petroleum franchise" relationship under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.,* between Shell and its lessee-dealers historically was controlled by several separate documents (collectively, the "lessee-dealer agreements"). The key agreements issued prior to Fall 1999 were a Motor Fuel Station Lease, which set forth the terms of the lease of the service stations from Shell, and a Dealer Agreement, which set forth the terms and conditions under which the lessee-dealer agreed to operate a Shell-brand service station. This latter agreement contained provisions for such things as the acquisition of gasoline and other petroleum products from Shell.

In the Fall of 1999, Shell amended its standard form lessee-dealer agreements. Shell sought to replace the Dealer Agreement with a Retail Sales Agreement, and to replace the Motor Fuel Station Lease with a Retail Facilities Lease (collectively, the "new agreements").[6] Shell offered the lessee-dealers the new agreements in September 1999, whether or not the lessee-dealer agreements had expired.

At this time, many lessee-dealers had significant time remaining under the lessee-dealer agreements. Shell refers to the lessee-dealers whose lessee-dealer agreements had not expired as "mid-termers."[7] Shell gave the mid-termers two choices: First, the mid-term lessee-dealer could decline to execute the new franchise agreements and continue to operate under the old agreements until the end of the old agreements' term or, alternatively, the mid-termer could terminate the lessee-dealer agreements before their expiration dates and commence operating under the new dealer agreements. Plaintiffs allege, more specifically, that in September 1999,

They accordingly have sought leave to amend their complaint, Motion for Leave to File Amended Complaint ("Amendment Motion") [Doc.# 16], and Defendants have responded ("Defendants' Response to Plaintiffs' Motion for Leave to Amend") [Doc. # 20]. On August 24, 2000, the Court granted Plaintiffs' Reconsideration Motion. This Memorandum reflects the Court's final ruling on Defendants' Motion after consideration of all the parties' submissions, including the proposed Plaintiffs' First Original Amended Complaint ("Proposed Amended Complaint"). Since the proposed amendments are futile, the Court denies Plaintiffs leave to amend.

**5.** These stations are as follows:

| Station | Lease Expiration Date |
| --- | --- |
| Scarsdale | February 1999 (month to month) |
| 43rd Road | December 1998 (month to month) |
| West Mount Houston | September 30, 1999 (month to month) |
| Sheldon | December 31, 1999 |
| South Main | November 30, 2000 |
| Humble | January 31, 2002 |
| Scott | March 31, 2001 |
| North Loop | June 30, 2002 |
| Silber | June 30, 2002 |
| Aldine | November 30, 2000 |
| Belfort | April 30, 2003 |
| Copperfield | December 31, 2003 |
| Highway 6/ Richmond | May 31, 2001 |
| Foxwood | May 31, 2001 |
| Cypress | May 31, 2002 |
| Ella | January 31, 2001 |
| Woodedge | February 29, 2000 |
| North Belt | November 31, 1999 |
| Highway 59 | December 31, 2003 |
| Racetrack | July 31, 2000 |
| Westheimer | September 30, 2000 |

**6.** Shell also included other agreements in the proposed package relating to the Shell franchise. The details of these are not pertinent to the Court's ruling.

**7.** *See* list *supra* in note 5.

Shell "presented Plaintiff[s] with a new set of dealer paper[work] significantly and arbitrarily altering the terms and conditions of the franchise relationship . . . ." Plaintiffs' Complaint, at 7, § 4.3. These new agreements, Plaintiffs contend, were accompanied by a letter from Shell (the "September 1999 letter") that stated that Shell would consider a request to

> terminate the existing agreement by Plaintiff's execution of a mutual termination agreement together with the signing of the newly presented retail sales agreement, lease, ETD or auto care paper as applicable.

*Id.* at 8, § 4.4. Plaintiffs allege that the September 1999 letter advised that if the lessee-dealer did not return the executed documents by October 31, 1999, a "request for renewal" would not be considered. Shell disputes this interpretation of the September 1999 letter, contending that Plaintiffs add an interpretive gloss that simply is not in the correspondence. Furthermore, Plaintiffs contend that Shell stated that it would not, under any circumstances, renew the franchise relationship if Plaintiffs did not execute the new agreements. *Id.* Shell also disputes this characterization of its September 1999 letter.[8]

Plaintiffs' responses to this letter varied depending on the circumstances of the stations. Plaintiffs attempted to sell the Racetrack, Westheimer, and Highway 59 locations back to Shell. *Id.* at 11–12, § 4.9.[9] On November 23, 1999, Plaintiffs abandoned their lessee-dealer agreements on eight other stations, the Highway 6, Foxwood, Cypress, Ella, Woodedge, Belfort, Copperfield and North Belt locations. *Id.* at 12, § 4.10. On September 27, 1999, Plaintiffs signed the new agreements for the Sheldon, South Main, Humble, Scott, North Loop, Silber, Aldine, Scarsdale,

43rd Road and West Mount Houston locations. *Id.* at 12–13, § 4.11. Plaintiffs allege that they attempted to sell the Scott, North Loop, Silber, and Aldine stations back to Shell, but they could not reach an agreement on the terms. Plaintiffs' Complaint, at 13, § 4.12. Plaintiffs also allege, as to the Scarsdale, 43rd Road, and West Mount Houston stations, that Shell failed to execute and return the new dealer documents to Plaintiffs. Therefore, Plaintiffs withdrew these signed agreements on November 20, 1999, and these stations continued the franchise relationship on a month-to-month basis under the terms of the prior lessee-dealer agreements.

In an attempt to ameliorate their financial losses allegedly caused by Shell, Plaintiffs filed this suit on February 22, 2000, alleging PMPA claims and various state law causes of action.[10] Shell has moved to dismiss the PMPA claim and the Motion is ripe for decision.

## II. APPLICABLE LEGAL STANDARDS

### A. *Motion to Dismiss*

■ A motion to dismiss should be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure only when the pleadings on their face reveal beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Shipp v. McMahon,* 199 F.3d 256, 260 (5th Cir.2000); *Garrett v. Commonwealth Mortgage Corp. of America,* 938 F.2d 591, 594 (5th Cir.1991). A plaintiff's complaint ordinarily need only be a short and plain statement that gives the defendant notice of what the claim is and the grounds upon which it rests.

---

8. *See infra* note 18 and accompanying text.

9. In their Complaint, Plaintiffs state that "[a]fter Plaintiff tendered back the Racetrack, Westheimer, and Highway 59 stations, Defendant failed and refused and continues to fail and refuse to pay the agreed upon purchase price." Plaintiffs' Complaint, at 12, § 4.9.

This allegation appears to relate to the breach of contract claim Plaintiffs assert. *See* Plaintiffs' Complaint, at 17–18, § 6.

10. Plaintiffs also assert claims for breach of contract, conversion, and fraud. These claims, however, are not addressed in Defendants' Motion to Dismiss.

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *see also Hart v. Bayer Corp.,* 199 F.3d 239, 248 n. 6 (5th Cir.2000).

In considering a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts as true and must view those facts in the light most favorable to the Plaintiff. *Campbell v. City of San Antonio,* 43 F.3d 973, 975 (5th Cir.1995). However, legal or unsupported conclusions need not be accepted, nor conclusory allegations taken at face value. *Campbell,* 43 F.3d at 975; *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992). "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery ... or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Campbell,* 43 F.3d at 975 (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1216, at 156–69 (footnote omitted)).

### B. *The PMPA*

The PMPA regulates the termination and non-renewal of franchise relationships. 15 U.S.C. § 2801 *et seq.* Plaintiffs base their PMPA claim on § 2802(a), which is a general prohibition against termination or non-renewal of franchises.[11] The PMPA mandates that a franchisor may terminate a franchise or may decline to renew any franchise relationship only when (1) the notification requirements of 15 U.S.C. § 2804 are met, and (2) the termination or non-renewal is based on grounds described in § 2802(b) of the statute. *See* 15 U.S.C. § 2802(b)(1). Specifically pertinent to Plaintiffs' claim, a franchisor may fail to renew a franchise when the franchisee refuses to agree to changes or additions to a new franchise agreement and:

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

*Id.* § 2802(b)(3)(A).

These provisions were designed for two purposes. First, the PMPA increases "the bargaining strength of individual franchisees in the petroleum industry" by limiting and regulating the circumstances under which a franchisor may terminate or fail to renew a petroleum franchise. *Halder v. Standard Oil Co.,* 642 F.2d 107, 109–10 (5th Cir.1981). The Act also, however, seeks to allow franchisors the ability to exercise their business judgment and modify their franchise agreements without undue interference from the courts. *See Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.,* 940 F.2d 744, 747 (1st Cir. 1991); *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 921 (6th Cir. 1989). The policy analysis by the court in *May–Som* is apt in defining this second aim of the PMPA: "[I]n an age of increasing corporate competition the major petroleum firms must retain the freedom to seek greater economic efficiency through corporate reorganizations, mergers and ac-

---

11. Section 2802(a) provides:

(a) Except as provided in subsection (b) of this section and section 2803 [which applies to trial and interim franchises] of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

15 U.S.C. § 2802(a). Subsection (b) of Section 2802 contains various grounds on which termination of non-renewal legitimately may be based.

quisitions." *May–Som*, 869 F.2d at 921. All the courts and cases cited by Plaintiffs subscribe to this same view. *See Chestnut Hill Gulf*, 940 F.2d at 751 (citing *Fresher v. Shell Oil Co.*, 846 F.2d 45, 46–47 (9th Cir.1988); *Cedar Brook Serv. Station, Inc. v. Chevron U.S.A., Inc.*, 746 F.Supp. 278 (E.D.N.Y.1990); *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, No. 86–4748, 1990 WL 61787, 1990 U.S. Dist. LEXIS 5685 (D.N.J. May 9, 1990); *Ackley v. Gulf Oil Corp.*, 726 F.Supp. 353 359 (D.Conn.), *aff'd per curiam*, 889 F.2d 1281 (3rd Cir. 1989)).

■ Under the Act's enforcement provision, a franchisee may maintain a civil action against a franchisor who fails to comply with the requirements of §§ 2802, 2803 or 2804. 15 U.S.C. § 2805(a). "In order to establish a claim under the PMPA, the plaintiffs must prove as a threshold matter a termination or non-renewal of their franchise relationship within the meaning of the PMPA." *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.,* 940 F.2d 744, 748 (1st Cir.1991) (citing 15 U.S.C. § 2805(c), and quoting *Ackley*, 726 F.Supp. at 359). *Accord Duff v. Marathon Petroleum Co.*, 51 F.3d 741, 744 (7th Cir.1995) (same). Once the franchisee establishes either termination or non-renewal, the franchisor has the burden to show that the termination or non-renewal is based on permissible factors under the PMPA. *Duff*, 51 F.3d at 744.

## III. DISCUSSION

### A. Plaintiffs' PMPA Claims

Shell has moved to dismiss Plaintiffs' PMPA claims on the ground that Plaintiffs have not alleged a termination or non-renewal in their Complaint and thus fail to state a claim upon which relief can be granted. The Court agrees.

Each group of Plaintiffs' stations must be addressed separately.

First, as to the three stations that Plaintiffs sold to Shell prior to the expiration of their lessee-dealer agreements,[12] Plaintiffs do not assert any PMPA claim. *See* Plaintiffs' Response, at 2. These three stations thus are not in issue.

#### 1. "Actual Termination" Claim

The Court initially construed Plaintiffs' Complaint as attempting to allege an actual termination or non-renewal as to each of the other eighteen stations listed.[13] Plaintiffs, however, assert in their Reconsideration Memorandum that they intend the actual termination theory to apply only to the Scarsdale, 43rd Road and West Mount Houston Road stations (the "month-to-month stations") which were operated on a month-to-month basis with Shell after their long-term leases expired.[14] This the-

**12.** Specifically, these are the Racetrack, Westheimer and Highway 59 stations. The Court here corrects an inadvertent misidentification of stations in its May 24th Memorandum. The Court's reference to the Scarsdale, 43rd Road and West Mount Houston Road stations was a clerical error.

**13.** These stations are listed *supra* at note 5 (stations #1—#18). In response to this broad argument, the Court held in the May 24th Memorandum that Plaintiffs did not allege facts to support a termination or non-renewal by Shell for any of these stations. To clarify, in the event Plaintiffs continue to assert an actual termination claim, the Court points out that for eight stations, *i.e.*, Highway 6, Foxwood, Cypress, Ella, Woodedge, Belfort, Copperfield, and North Belt, Plaintiffs elected to abandon their leases on November 23, 1999. Plaintiffs' Complaint, at 12. The

Court's earlier conclusion therefore remains correct; it was Plaintiffs—in the midst of the terms of these stations' existing leases—that took action to end these stations' respective relationships with Shell. The Court also held in the May 24th Memorandum, as to the Sheldon, South Main, Humble, Scott, North Loop, Silber, and Aldine stations (for which Plaintiffs signed the new agreements on September 27, 1999), that there was no actual non-renewal or termination because Plaintiffs acted prior to the expiration of the leases for each of those stations. Plaintiffs elected as to these stations to enter into new franchise arrangements. Therefore, Plaintiffs failed to state a claim for actual termination as to the fifteen stations that are listed in note 5 (and in Plaintiffs' Complaint as #4—#18).

**14.** *See* Plaintiffs' Reconsideration Memorandum, at 2, § 3.

ory requires close analysis of the law and Plaintiffs' Complaint.[15]

■ In order to state a claim under the PMPA, Plaintiffs must allege as a threshold matter either a termination or non-renewal of a franchise agreement. *See id.* § 2805(c). The Court is limited in its analysis by the language of the PMPA. *See Uniroyal Chemical Co. v. Deltech Corp.,* 160 F.3d 238, 244 (5th Cir.1998) ("[T]he starting point for statutory interpretation is the language of the statute itself.... When that language is plain we must abide by it.") (citing *Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978)).[16] To

the extent relevant to the issues before this Court, "failure to renew" and "non-renewal" under the PMPA require allegations that the franchisor has "fail[ed] to reinstate, continue or extend the franchise relationship" "at the conclusion of the term, or on the expiration date, stated in the relevant franchise." 15 U.S.C. § 2801(14)(A).[17] The word "termination" *per se* is not fully defined in the statute, although the Act does state that the term "includes cancellation of the franchise relationship." *Id.* § 2801(17).

■ To support their claim of actual termination, Plaintiffs make extensive allegations in their Complaint concerning the September 1999 letter that accompanied Shell's proposed new dealer agreements.[18]

**15.** The Proposed Amended Complaint is identical to Plaintiffs' Complaint except that Plaintiffs clarify that their actual termination claim relates only to three stations (Scarsdale, 43rd Road, and West Mount Houston). *See* Proposed Amended Complaint, at 17, § 5.2.

**16.** The Court must consider the statutory language (or absence thereof) in determining if an implied claim of constructive termination should be endorsed. The Fifth Circuit generally has stated as to statutory construction:

In determining the meaning of the statute, we must look not only to the particular statutory language, but also to the statute as a whole, including its design, object, and policy. *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) (citing *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988), and *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987)); *Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989) (citing *Pilot Life Ins. Co.,* 481 U.S. at 51, 107 S.Ct. at 1555). "[T]he meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991) (citing *Shell Oil Co. v. Iowa Dept. of Revenue,* 488 U.S. 19, 26, 109 S.Ct. 278, 282, 102 L.Ed.2d 186 (1988); *see also id.* (" 'Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used ....' ") (quoting Judge Learned Hand in *N.L.R.B. v. Federbush Co.,* 121 F.2d 954,

957 (2nd Cir.1941)) (quoted in *Shell Oil,* 488 U.S. at 25 n. 6, 109 S.Ct. at 281 n. 6). *New York Life Ins. Co. v. Deshotel,* 142 F.3d 873, 885–86 (5th Cir.1998).

**17.** The terms "failure to renew" and "non-renewal" are defined in the PMPA as a "failure to reinstate, continue or extend the franchise relationship—

(A) at the conclusion of the term, or on the expiration date, stated in the relevant franchise;

(B) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date; or

(C) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978, and has not been renewed after such date." 15 U.S.C. § 2801(14).

**18.** Defendants complain that Plaintiffs materially mischaracterize the September 1999 letter in the Complaint. Defendants therefore supply a copy of the letter for the Court's review. *See* Defendants' Reply, Exhibit C. To the extent consideration of the letter would require conversion of Defendants' pending request for relief to a motion seeking summary judgment under Rule 56, *see* FED. R. CIV. P. 12(b), this notice of conversion is deemed to have been given to the parties via the May 24th Memorandum. In any event, Plaintiffs' extensive references in their Complaint to the letter render this case analogous to the securities cases in which the courts are permitted to consider matters incorporated in the complaint and matters of which the court may take judicial notice. *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017–18 (5th Cir.1996) (holding that in deciding a motion

Plaintiffs' allegations however do not support an actual termination claim under the PMPA as to the month-to-month stations. Plaintiffs allege that Shell stated in the September 1999 letter that it would consider a request by the lessee-dealer to terminate its existing lessee-dealer arrangement if all the documents proffered with the letter were executed by both the lessee-dealer and Shell by a specified deadline. This communication was a proposal and specified a possible future course of action; it was not an actual termination or non-renewal. Plaintiffs nowhere in their Complaint allege that Shell actually terminated these three stations' month-to-month arrangements or the entire franchise relationship.[19]

Plaintiffs, implicitly acknowledging that the September 1999 letter does not contain language to support an actual termination claim, contend that, separate and apart from the September 1999 letter, they have alleged facts that constitute allegations of cancellation or termination of the "relationship" as to these stations.[20] However, Plaintiffs' argument does not faithfully reflect the pertinent language in the Complaint. The sentence on which Plaintiffs rely states in its entirety:

> In connection with the presentation of the new dealer paper, [Shell] further represented that if Plaintiff failed to execute and return by the deadline, [Shell] would not under any circumstance renew the relationship for the particular station, thereby requiring Plaintiff to enter into new agreements prior to the end of the term of the existing agreements or else suffer the consequences when the existing agreements' termination date arrived.

Plaintiffs' Complaint, at 8, § 4.4 (the "take-it-or-leave-it sentence").[21] This sentence specifically refers to stations whose leases had *not* previously expired. The three stations that Plaintiffs now claim are the subject of their actual termination claim each had long-term leases that had expired prior to or contemporaneously with Shell's new agreement offer, and were on month-to-month arrangements. The "take it or leave it sentence" is therefore merely a conclusory allegation that does not encompass these three stations, and does not support a claim of actual termination.[22]

to dismiss, the district court could properly rely on documents filed with the Securities and Exchange Commission). The Court may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions" even if the documents are not attached to the complaint. *See Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994); *see also Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 n. 3 (1st Cir.1991).

19. Rather, Plaintiffs allege as to these three stations that Defendants refused to enter into new franchise agreements after the prior long-term leases had expired. Plaintiffs' Complaint, at 5, § 4.2. Plaintiffs also assert that they abandoned these locations after they lost economic viability. *See* Plaintiffs' Complaint, at 13, § 4.11.

20. *See* Plaintiffs' Reconsideration Memorandum, at 2–3, purporting to quote Plaintiffs' Complaint, at 8, § 4.4 (last paragraph).

21. Section 4.4's allegations are identical in Plaintiffs' Complaint and the Proposed Amended Complaint.

22. It is also noted that Plaintiffs do not allege that Shell actually took actions to implement the alleged terminations or non-renewals as to these or other stations.

Plaintiffs' argument also lacks substance because it requires a grossly artificial reading of their Complaint. The take-it-or-leave-it sentence must be read in context of the immediately preceding paragraph, which appears in the *same numbered section* of the Complaint. That paragraph states:

> The new dealer paper for each of the 21 locations is identical and *was accompanied by a letter advising* that Defendant would consider a request to terminate the existing agreement by Plaintiff's execution of a mutual termination agreement together with the signing of the newly presented retail sales agreement, lease ETD, or auto care paper as applicable. *Defendant further advised* that it would consider the Plaintiff's execution of this new dealer paperwork to be a request by Plaintiff upon Plaintiff's return of executed copies of the enclosed

Last, as to the month-to-month stations, Plaintiffs' contentions ignore the guidance in *Halder v. Standard Oil Co.*, 642 F.2d 107, 111 (5th Cir.1981), in which the Fifth Circuit held that a dealer's requiring a lessee-dealer to operate on a month-to-month arrangement after the expiration of the term of the original lease agreement did not qualify as an actual termination under the PMPA. Thus, a franchisor's failure to enter into a new franchise agreement does not necessarily implicate the termination provisions of the PMPA. "The PMPA requires only that the franchise relationship, and not the franchise itself, be renewed." *Cinco J, Inc. v. Boeder*, 920 F.2d 296, 299 (5th Cir.1991) (citing *Halder*, 642 F.2d at 111). The Act requires that

the "franchise relationship" be maintained, but does not intend to address "the specific rights or obligations of the parties under the franchise. agreement." *Halder*, 642 F.2d at 111 (quoting S. REP. No. 95–731, at 30, *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS 837, 888).[23]

Accordingly, Plaintiffs' Complaint is insufficient to state a claim of actual termination or non-renewal of a franchise relationship under the PMPA as to the three month-to-month stations or any of the other eighteen stations in issue in this case.[24]

### 2. "Constructive Termination" Claim

■ Plaintiffs argue that they suffered a "constructive" termination or non-renew-

---

documents by no later than October 31, 1999; ... *The letter further advised* that if Plaintiff did not return the executed documents by the deadline of October 31, 1999, a request for renewal would not be considered. *Defendant's letter further advised* that returned executed documents would not be binding on it until executed by an authorized representative of Defendant. Finally, *the letter advised* that the effective date of the agreement would be the first day of the month following the execution of these new dealer agreements.

*Id.* at 7, § 4.4 (emphasis added). Therefore, the obvious inference of the take-it-or-leave-it sentence is that Plaintiffs also intended to refer to the September 1999 letter there as well.

To the extent Plaintiffs are attempting by the take-it-or-leave-it sentence to allege a communication from Shell other than the September 1999 letter, the sentence is merely conclusory argument. Plaintiffs have failed to plead adequate facts to elevate this one sentence to a legally meaningful allegation. There is no identification in the Complaint (or in Plaintiffs' other submissions) of any particular Shell representative who allegedly made the allegedly threatening statement independent of the September 1999 letter. Nor is there any allegation as to when any such oral communication was made. Nor is there any suggestion of which station or stations were the subject of the alleged comment. In sum, the allegation, as belatedly interpreted by Plaintiffs, is too vague to support the legal significance that Plaintiffs ascribe to it. *See Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir.1995) (holding that the court need not credit conclusory allegations in determin-

ing whether plaintiff has failed to state a claim).

23. The franchise is defined to contain three elements: a contract to use the refiner's trademark, a contract for supply of fuel to be sold under the mark, and a lease of premises for sale of the fuel. 15 U.S.C. § 2801(1); *see Barnes v. Gulf Oil Corp.*, 795 F.2d 358 (4th Cir.1986).

24. These deficiencies are not cured in the Proposed Amended Complaint. Their sole allegation that Plaintiffs add about the actual termination claim is that "[Shell's] arbitrary and unconscionable changes to the lease provision that were proposed to Plaintiff on a one time take it or leave it basis with no negotiations possible amounted to an actual termination of the franchise relationship for stations 1–3, since the previous terms had expired as defined under 15 U.S.C.A. § 2801(14)(A) and/or (B)." Proposed Amended Complaint, at 17, § 5.2. This allegation adds nothing of legal significance. The new sentence is a argument or an attempted legal conclusion, rather than a factual allegation. Plaintiffs plead no facts to establish that Shell did in fact terminate the parties' existing month-to-month arrangements. To the extent that Plaintiffs interpret the language of the September 1999 letter to include Plaintiffs' month-to-month arrangements, they still merely allege a threat to discontinue the parties' relationship as to these three stores. This proposed allegation, therefore, is insufficient as a matter of law to constitute an "actual termination" under the PMPA. Plaintiffs' Reconsideration Motion concerning the actual termination claim is therefore denied in this respect.

al [25] with respect to the remaining fifteen of the eighteen stations in issue.[26] Plaintiffs assert that constructive termination occurred when Shell allegedly refused to negotiate a new franchise agreement in good faith by making the alleged "take it or leave it" offer in September 1999, which Plaintiffs contend required them either to sign Shell's proposed new agreements or to forfeit their franchises at the end of the term under the respective lessee-dealers agreements, while Defendants were in breach of several of their duties under the lessee-dealer agreements and/or violated state law.[27] In other words, Plaintiffs propose that a franchisee may sue a franchisor for constructive termination if the franchisor violates one or more of economic terms of the component agreements comprising the franchise relationship (or state law), thereby causing economic harm to the franchisee, while the franchisor seeks to introduce new franchise contracts.[28]

Plaintiffs contend that the First, Second, Fourth, Sixth, and Eleventh Circuits have "all recognized constructive termination in PMPA cases." [29] Plaintiffs' Response, at 5 (citing *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744 (1st Cir.1991); *Cedar Brook Service Station, Inc. v. Chevron U.S.A., Inc.*, 746 F.Supp. 278 (E.D.N.Y.1990), *aff'd without opinion*, 930 F.2d 908 (2d Cir.1991); *Ackley v. Gulf Oil Corp.*, 889 F.2d 1280 (2d Cir.1989); *Barnes v. Gulf Oil Corp.*, 795 F.2d 358 (4th Cir.1986); *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917 (6th Cir.1989); [30] *Shukla v. BP Exploration & Oil, Inc.*, 115 F.3d 849 (11th Cir.

25. Plaintiffs do not distinguish between the concept of constructive termination and constructive non-renewal, and the Court therefore will refer solely to constructive termination to encompass both concepts.

26. Plaintiffs originally argued constructive termination across the board. However, in their Reconsideration Motion they have narrowed the scope of this theory to the stations located at Sheldon, South Main, Humble, Scott, North Loop, Silber, Aldine, Belfort, Copperfield, Highway 6/Richmond, Foxwood, Cypress, Ella, Woodedge, and North Belt. *See* Proposed Amended Complaint, at 17, § 5.2.

27. *See* Plaintiffs' Reconsideration Memorandum, at 3–4 (citing Plaintiffs' Complaint, §§ 4.13, 4.15, 4.16, 4.17, and generally §§ 4.2—4.7, 4.9 and 4.12—4.21); Plaintiffs' Reply, at 2–3. Specifically, Plaintiffs cite to allegations in their Complaint that Shell withheld proceeds from gasoline, grocery, and sundry items sales (*see* Plaintiffs' Complaint, § 4.13), "arbitrarily and without notice" charged "excessive rents over and above the existing contracted rents" (*see id.* § 4.15), overcharged Plaintiffs for "multiple gas deliveries" (*see id.* § 4.6), "in part" suspended gas delivery privileges (*see id.* § 4.17), failed to grant approval of an earnest money contract for Plaintiffs' sale of four stations pursuant to the parties' agreement (*see id.* § 4.12), refused to provide Plaintiffs with immediate "stick readings to determine the amount of gas inventory remaining on the stations after returned by Plaintiff[s]" (*id.* § 4.18), made "unauthorized debits of rent and gas" along with their failure to credit Plaintiffs' account for gas inventory, convenience store inventory, purchase of equipment and car washes, lead-

ing to inability of Plaintiffs to finance the business operations (*see id.* § 4.19), and violated "various promises" in connection with Plaintiffs' operation of the Highway 59 station (*see id.* §§ 4.20, 4.21).

28. The Court recognizes that Plaintiffs complain that various alleged violations of the existing dealer agreements had severe economic consequences to them. However, Plaintiffs fail to specify exactly what clauses allegedly were violated by Defendants. In any event, suffering severe adverse economic consequences from a franchisor's conduct *per se* is not sufficient to state a claim for constructive termination, even in the assignment context. *See, e.g., Clark v. BP Oil Co.*, 137 F.3d 386, 391 (6th Cir.1998); *Shukla*, 115 F.3d at 853–54.

29. While Plaintiffs only explicitly argue "constructive termination," they apparently intend to refer to both "constructive termination" and "constructive non-renewal."

30. *May–Som Gulf, Inc.*, 869 F.2d 917, is deemed by many to be the seminal case. In *May–Som Gulf*, defendant franchisor, Chevron, sold its Ohio-based Gulf-brand marketing operations. *Id.* at 918. This sale resulted in Chevron's assignment to Cumberland Farms, Inc. of franchise agreements with twelve independent Gulf service station franchisees. The franchisees asserted a PMPA claim alleging that the sale constructively terminated their franchises. *Id.* at 919. The Sixth Circuit held that the mere assignment by a franchisor in the course of a corporate sale of assets does not constitute a constructive termination under the PMPA unless:

1997)).[31] Plaintiffs further argue that their allegations place this case within the circumstances described by the Fifth Circuit in *April Marketing & Distributing Corp. v. Diamond Shamrock Refining and Marketing Co.*, 103 F.3d 28, 29–30 (5th Cir.1997), that would be necessary to state a claim for constructive termination, *if* the Circuit decides to recognize such a cause of action. Each of Plaintiffs' contentions will be addressed in turn.

Plaintiffs' cited decisions are not dispositive of the constructive termination question here, *i.e.*, whether courts' endorsements of a constructive termination cause of action in the franchisor assignment context support broader applications of the constructive termination theory in settings other than franchisor-assignments. Nothing in the cited authorities or other rulings the Court could locate directly supports Plaintiffs' theory. Indeed, adoption of Plaintiffs' position would be a significant expansion of existing case law. In each of the cited non-Fifth Circuit cases, the alleged constructive termination was precipitated by the franchisor's assignment of the franchise to a third party and the franchisor's resulting disassociation from

> (1) in making the assignment, the franchisor breached one of the three statutory components of the franchise agreement (the contract to use the refiner's trademark, the contract for the supply of motor fuel, or the lease of the premises); or
> (2) the assignment was made in violation of state law.
>
> *Id.* at 922. Since the *May–Som* plaintiffs had not established either of these requirements, the Sixth Circuit held that there was no constructive termination under the PMPA. *Id.* at 922.

**31.** Plaintiffs also rely on the Ninth Circuit's decision in *Simmons v. Mobil Oil Corp.*, 29 F.3d 505 (9th Cir.1994). However, this reliance is misplaced. The Ninth Circuit stated in that case: "we do not reach the merits of Simmons' claim that Mobil violated the PMPA with a 'coercive' termination that finally occurred in January of 1990." *Id.* at 511. Instead, the court of appeals concluded that the plaintiff's action was barred by the one-year statute of limitations in 15 U.S.C. § 2805(a). *Id.*

the relationship, notwithstanding the continuation of the franchise. Therefore, the cases on which Plaintiffs rely are inapposite. Further none are Fifth Circuit decisions and thus none are binding on this Court.

The only potential Fifth Circuit authority Plaintiffs cite in response to this analysis is the *dicta* in *April Marketing*, 103 F.3d at 29–30, which forms the basis for Plaintiffs' second constructive termination claim argument. *April Marketing* did not involve an assignment by a franchisor of its assets or franchise contract duties.[32] The Fifth Circuit began its analysis of the plaintiff's constructive termination claim by noting that "[t]his circuit has not recognized a cause of action for 'constructive termination' under the PMPA." *Id.*[33] The court ultimately held that:

> We need not address whether a franchisee can ever state a cause of action for wrongful termination under the PMPA absent a formal termination or cancellation of the franchise by the franchisor. We hold only that the PMPA's termination provision is not implicated if the franchisor has acted within its rights under the franchise.[34]

**32.** The plaintiff in *April Marketing* was a wholesale and retail distributor of motor fuel which had various franchise-related agreements with defendant Diamond Shamrock, the gasoline supplier. *See April Marketing*, 103 F.3d at 29. Plaintiff April Marketing alleged that Diamond Shamrock "constructively terminated" the plaintiff's franchise when the defendant: (1) entered into direct competition with the plaintiff by opening its own retail stores and selling gasoline to its own stores below wholesale price; (2) restricted use of its corporate logo at the plaintiff's new locations; and (3) terminated the plaintiff's credit line. *Id.*

**33.** The court of appeals nevertheless went on to analyze the proof in the record before it. The panel then "conclude[d]" that "a franchisor's actions, if those actions do not breach the franchise, cannot be considered a 'termination' within the meaning of the PMPA," 103 F.3d at 31, but refused to characterize this statement as its "holding." *Id.*

**34.** The court of appeals did not specify what it meant by the term "franchise" here. It is

*Id.* at 31. The Fifth Circuit did not deem the facts before it sufficient to support a constructive termination claim under the PMPA, if one even existed in this circuit.

The *April Marketing* panel noted that typically a franchisor's assignment is involved in constructive termination cases. *Id.* at 30 n. 4. The court of appeals, however, did not address the absence of an assignment in the case before it. There is no indication that this point was argued by the parties.

The *April Marketing* court's skepticism of the constructive termination claim was evidenced, first, by that court's refusal to reach the issue of the existence of that claim. Second, the *April Marketing* panel cited and gave a detailed discussion of an unpublished decision in *McGinnis v. Star Enter.*, No. 93–1234, 8 F.3d 20 (Oct. 21, 1993), in which another Fifth Circuit panel declined to definitively decide the issue of the existence of a constructive termination claim.[35] Therefore, *April Marketing* does not determine the legal issue before this Court, and the Court will analyze the matter afresh.

The Court concludes as a matter of law that the circumstances alleged by Plaintiffs in their Complaint do not support a claim for constructive termination under the PMPA.[36] The Fifth Circuit's expressed reluctance to adopt this course appears well founded. A constructive termination claim in the absence of an assignment of the franchise by the franchisor would upset the balance the PMPA seeks to achieve through competing rights granted to franchisees and franchisors, respectively. The PMPA "must be given" a "liberal construction consistent with its overriding purpose to protect franchisees." *Chestnut Hill Gulf, Inc.*, 940 F.2d at 750 (quoting *May–Som Gulf, Inc.*, 869 F.2d at 921 (internal quotes omitted)). "But because it diminishes the property rights of franchisors", the Act "should not be interpreted to reach beyond its original language and purpose." *Id.* (citing *May–Som Gulf, Inc.*, 869 F.2d at 921; *see also Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988)).

Plaintiffs at bar point to no specific provision of the PMPA that supports judicial creation of the constructive termination claim they advocate, nor any provision that guides the limits of such a proposed claim.[37] In contrast, the assignment-relat-

unclear if the panel intended to refer to all the day-to-day business dealings involved in each of the contracts that comprise the franchise relationship, or to refer to the franchise relationship in its general sense, *see id.*, or the terms in the parties' contract relating to assignment rights.

**35.** The *April Marketing* court's discussion of *McGinnis* is reproduced here in its entirety: In *McGinnis v. Star Enter.*, 8 F.3d 20 (1993) (unpublished), a franchisee brought suit against a franchisor alleging that the franchisor had constructively terminated a franchise in violation of the PMPA along with causes of action for breach of contract, violation of the Texas Deceptive Practices Act, and antitrust violations. The majority of the court's opinion focused on the effect of a release between the parties, which had resolved a previous dispute. The court concluded broadly that "[e]ach of plaintiffs' claims is either barred by the release clause or lacks adequate evidence to survive summary judgment." *Id.* at 10. Despite this general conclusion, which would appear to have resolved all the plaintiff's claims, the court nevertheless ad-

dressed the plaintiff's PMPA wrongful termination claim specifically. The court discussed the lack of summary judgment proof of termination, including the fact that the franchise had continued in effect "at all times relevant to this action." *Id.* at 9. Interestingly, the court went further to state that "[t]he plain meaning of the [PMPA] does not provide for 'constructive termination.'" *Id.* We need not address whether this language from *McGinnis* is dictum or whether, as April Marketing urges, it is a binding alternative holding; as discussed below, the facts alleged by April Marketing do not state a claim for constructive termination even if such a cause of action exists.

103 F.3d at 30.

**36.** This is also true as to the allegations in the Proposed Amended Complaint, which simply proposes allegations that limit the constructive termination claim to the stations labeled 4 through 18 in the Complaint.

**37.** This result is consistent with courts' reluctance to recognize implied private rights of action. *See, e.g., Cort v. Ash*, 422 U.S. 66, 78–

ed constructive termination claim is tied to the language of the PMPA. The Act explicitly permits the franchisor's assignment of its duties and resulting withdrawal from the franchise only under specified circumstances, namely, when the franchisor's assignment is valid under both state law and the parties' franchise contracts. *See* 15 U.S.C. §§ 2802(b)(2)(E)(iii)(II),[38] 2806(b).[39] The PMPA's assignment provisions accordingly create a defined framework for the constructive termination claim in the franchisor assignment setting. *See, e.g.,*

*Clark v. BP Oil Co.,* 137 F.3d 386, 390 (6th Cir.1998) (quoting *May–Som Gulf, Inc.,* 869 F.2d 917, 923 (6th Cir.1989)); *Shukla v. BP Exploration,* 115 F.3d 849, 853–54 (11th Cir.1997) (citing *May–Som Gulf, Inc.,* 869 F.2d at 922).[40]

Outside the franchisor-assignment context, the Act only contemplates that there will be a continuation or extension of the franchise relationship in the most general sense. *See, e.g., Halder,* 642 F.2d at 111. There is no requirement, at the time of

---

79, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Sigmon v. Southwest Airlines Co.,* 110 F.3d 1200, 1205 (5th Cir.1997). In evaluating whether a federal statute creates an implied cause of action, "a four factor test is to be applied: (1) whether the statute creates a federal right or 'especial benefit' for a class of which plaintiffs are members; (2) whether there is any indication of legislative intent, explicit or implicit, to create a private cause of action; (3) whether implying a private cause of action would be consistent with the purpose of the legislative scheme; and (4) whether the cause of action urged by the *plaintiff* is one traditionally relegated to state law." *Sigmon,* 110 F.3d at 1205 (citing *Cort,* 422 U.S. at 78–79, 95 S.Ct. 2080). As the Fifth Circuit stated, congressional intent is the touchstone for determining whether a federal statue creates a private right of action. *Id.* (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Louisiana Landmarks Society, Inc. v. City of New Orleans,* 85 F.3d 1119, 1123 (5th Cir.1996)). The Fifth Circuit has recognized a "presumption that Congress did not intend to create a private right of action," and a plaintiff "bears the relatively heavy burden of demonstrating that Congress affirmatively contemplated private enforcement when it passed the relevant statute". *Louisiana Landmarks Society,* 85 F.3d at 1123 (internal quotations omitted). While the circumstances at bar are somewhat different from those in these cited cases, Plaintiffs seek to imply a cause of action from the PMPA where the statute has not expressly granted such rights. The Court therefore has analyzed Plaintiffs' theory with an eye to the *Cort* standards.

**38.** A franchisor may terminate or decline to renew a franchise

(E)(iii) in the case of leased marketing premises—

\* \* \* \* \* \*

(II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor's interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

15 U.S.C. § 2802(b)(2)(E)(iii)(II).

**39.** 15 U.S.C. § 2806(b) provides:

Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

**40.** As noted above, courts repeatedly have insisted on interpreting the PMPA (generally and in the constructive termination context) according to its literal terms. *See Chestnut Hill Gulf,* 940 F.2d at 750. The renewal provisions of the PMPA "address the renewal of the relationship between the parties rather than the specific rights or obligations of the parties under the franchise agreement." *April Marketing,* 103 F.3d at 30–31; *Halder v. Standard Oil Co.,* 642 F.2d 107, 111 (5th Cir.1981); *Ackley,* 726 F.Supp. at 361 (quoting S. REP. No. 95–731, at 30, *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS, at 888).

renewal, that the specific provisions of underlying agreements within the franchise relationship be continued. Without a statutory underpinning, there is no workable definition or limitation on the proposed constructive termination theory in the nonassignment context. This Court does not sit as a one-person legislature. This ambitious cause of action cannot be created by a court in the absence of a clear legislative mandate or binding appellate judicial guidance.

Further, as a practical matter, if the broad-based constructive termination claim is endorsed, courts will face the difficult, if not impossible, task of defining the limits of the claim without any assistance from Congress. Adjudication of such claims necessarily would involve courts in disputes between franchisees and franchisors to sort out alleged contract breaches whenever new contract terms are being proposed by the dealers, whether or not the existing franchise agreements have expired. This result goes well beyond the intent and the language of the PMPA.

▮ The Court therefore declines Plaintiffs' invitation to dramatically expand the reach of the PMPA through the unwieldy vehicle of a constructive discharge theory that Plaintiffs seek to assert in this case. It is noted that the Court does not rule that there never can be a constructive termination claim:[41] The Court merely concludes that a franchisee does not state a claim for constructive termination of the franchise relationship merely because the franchisee claims that the franchisor has imposed economic hardship on the franchisee through alleged breaches of one or more financial, lease or other duties under a contract within the franchise relationship while the franchisor is offering new franchise-related agreements.

### 3. Conclusion as to PMPA Theories

In summary, each of Plaintiffs' PMPA arguments fails. Plaintiffs allegations do not satisfy, as to any of their stations, the PMPA's statutory requirement of an actual termination or non-renewal "at the conclusion of the term, or on the expiration date, stated in the relevant franchise." 15 U.S.C. § 2801(14) (emphasis added). As to their constructive termination theory, Plaintiffs have cited no probative authority to support the relief sought and the Court declines to infer the existence of this claim from the PMPA's limited provisions. Plaintiffs therefore have failed to state a legally viable claim of unlawful termination or non-renewal under the PMPA as to any of their stations and the PMPA claims must be dismissed.[42]

41. Plaintiffs also contend on reconsideration, as a procedural matter, that the Court should not definitively address the issue of constructive termination in response to Defendants' Motion to Dismiss since all other cases have reached the question through summary judgment motions or after trial. Since the Court reaches its conclusions concerning the PMPA claims alleged by Plaintiffs solely on legal grounds, accepting the allegations in the Complaint as true, a summary judgment motion is not necessary, except possibly to the extent the September 1999 letter is relied upon as an alternative basis for certain conclusions. See supra note 18. Should the court of appeals determine that a constructive termination claim exist under the facts as pleaded by Plaintiffs, then the parties will be required to address the claim in connection with a summary judgment motion after appropriate discovery.

42. As noted above where appropriate, Plaintiffs seek leave to amend the Complaint to add allegations to clarify the stations for which Plaintiffs seek to assert an actual termination claim and the stations relating to a constructive termination claim. See Amendment Motion, at 1; Proposed Amended Complaint, at 17, § 5.2. Although leave to amend should be freely given, under most circumstances the Court may deny a motion "when [amendment] would be futile ...." *Federal Deposit Insurance Corporation v. Conner*, 20 F.3d 1376, 1385 (5th Cir.1994). In this Memorandum, the Court has considered each of the proposed new allegations. The Court's rulings are based on the allegations in both Plaintiffs' Complaint and the Proposed Amended Complaint. Since Plaintiffs' Proposed Amended Complaint does not cure the legal defects in Plaintiffs' claims, the Court denies Plaintiffs' Motion for Leave to Amend as futile.

## B. *Pendent State Claims*

■ Dismissal of Plaintiffs' PMPA claims leaves a case in which Plaintiffs assert only pendent state law claims. Under 28 U.S.C. § 1367(c)(3), a federal court may decline to exercise supplemental jurisdiction over state claims that remain after dismissal of the claims over which the court originally had subject-matter jurisdiction. *See Robertson v. Neuromedical Center,* 161 F.3d 292, 296 (5th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1575, 143 L.Ed.2d 671 (1999) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *Parker & Parsley Petroleum Co. v. Dresser Industries,* 972 F.2d 580, 585 (5th Cir.1992) ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed."). Generally, the decision whether to dismiss these types of pendent state claims rests in the sound discretion of the trial judge. *See Robertson,* 161 F.3d at 296.

The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. This case was filed relatively recently and discovery has not yet begun. No prejudice will result from Plaintiffs being required to pursue their state law causes of action in state court. *See* 28 U.S.C. § 1336(d) (regarding tolling of the limitations period). Therefore, the Court dismisses Plaintiffs' state law claims without prejudice to the refiling of these claims in state court.

## IV. *CONCLUSION*

For the reasons discussed above, the Court concludes that Defendants' Motion to Dismiss Plaintiffs' Petroleum Marketing Practices Act Claim has merit, and Plaintiffs' PMPA claims must be dismissed. In addition, the Court exercises its discretion to decline to retain supplemental jurisdiction over Plaintiffs' state law claims. Plaintiffs' Reconsideration Motion is without merit to the extent it seeks to alter the outcome on the legal conclusions expressed by this Court. Finally, Plaintiffs' Motion for Leave to Amend the Complaint lacks merit since the proposed amendments would be futile. Therefore, Plaintiffs' Complaint will be **dismissed.** It is therefore

**ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Petroleum Marketing Practices Act Claim [Doc. # 10] is **GRANTED.** It is further

**ORDERED** that Plaintiffs' pendent state law claims are **DISMISSED WITHOUT PREJUDICE** to refiling in state court to the extent permitted by law. It is further

**ORDERED** that Plaintiffs' Motion for Reconsideration [Doc. # 18] is **DENIED,** except that the Court has corrected in this Memorandum and Order various factual inaccuracies in the Court's May 24, 2000 Memorandum and Order (vacated by Order issued August 24, 2000). It is further

**ORDERED** that Plaintiffs' Motion for Leave to Amend [Doc. # 16] is **DENIED** as futile.

The Court will enter a separate final judgment.